UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

MALVEAUX                                   CIVIL ACTION NO. 6:15-cv-02728

VERSUS                                     JUDGE DOHERTY

U.S. COMMISSIONER,                         MAGISTRATE JUDGE WHITEHURST
SOCIAL SECURITY
ADMINISTRATION


## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be affirmed.

### ADMINISTRATIVE  PROCEEDINGS

The claimant, Ray Anthony Malveaux, fully exhausted his administrative

remedies prior to filing this action in federal court.  The claimant filed an application

for disability insurance benefits ("DIB") and an application for supplemental security

income benefits ("SSI"), alleging disability beginning on June 28, 2011.[1]  His

applications were denied.[2]  The claimant requested a hearing,[3] which was held on

---

[1]      Rec. Doc. 7-1 at 32.

[2]      Id. at 5-8.

[3]      Id.  at 27.

April 21, 2014 before Administrative Law Judge Kim A. Fields.[4]  The ALJ issued a

decision on June 10, 2014,[5] concluding that the claimant was not disabled within the

meaning of the Social Security Act ("the Act") from June 28, 2011 through the date

of the decision.  The claimant asked for review of the decision, but the Appeals

Council concluded on September 4, 2014, that no basis existed for review of the

ALJ's decision.[6]  Therefore, the ALJ's decision became the final decision of the

Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).

The claimant then filed this action seeking review of the Commissioner's decision.

### SUMMARY OF PERTINENT FACTS

The claimant was born on October 6, 1974.[7]  At the time of the ALJ's decision,

he was 36 years old, defined as a younger individual under the Act. He has at least a

high school education and received a Graduate Equivalency Degree (GED).[8] He has

past relevant work experience as a construction and oil field laborer and roustabout.[9]

---

[4]     The hearing transcript is found at Rec. Doc. 7-1 at 48.

[5]     Id. at 43.

[6]     Id. at 11.

[7]     Id. at 41.

[8]     Id.

[9]     Id. at 230.

He alleges that he has been disabled since June 28, 2011[10] due to back pain and anxiety, depression and panic attacks.[11]

On June 25, 2011, Mr. Malveaux was evaluated by Paul E. Fenn, M.D., after experiencing low back pain when he picked up on a jet hose while working as a roustabout. *T.250.* Dr. Fenn's report indicates he would treat the claimant's injury as a lumbar strain and prescribed Motrin and Tylenol. *T.253.*

On June 29, 2011, the claimant was treated by John Rainey, M.D., his primary care provider, for complaints of back and shoulder pain. *T.265-266.* Dr. Rainey's assessment was lumbar strain. He referred the claimant to physical therapy and provided an injection of Toradol. *T.266.*

On July 21, 2011, the claimant was examined by orthopedic surgeon George Williams, M.D. on referral from the workers' compensation insurer. At that time, the claimant complained of back pain which had "progressively increased" since his June 25, 2011 injury. *T.279-281.* Dr. Williams' examination revealed positive straight leg raise testing on the left and tender SI joints bilaterally; he ordered a lumbar MRI. *T.280-281.*

---

[10]     Id.  at 239.

[11]     Id. at 35, 239.

-3-

An August 9, 2011 MRI of the lumbar spine revealed edema in the subcutaneous tissues of the posterior back, minimal to mild annular bulging at L3-L4 and L4-5, as well as disc desiccation at L5-S1 with disc space narrowing posteriorly, T2 hyper-intense zone in the posterior disc, a broad based central/left paracentral disc protrusion abutting the left S1 nerve and mild bilateral neural foraminal narrowing. *T.269*.

On August 30, 2011, Dr. Williams assessed the claimant with a disc protrusion with annular tear at L5-S1 with compression of the S1 nerve root and degenerative disc disease at L4-L5; he recommended physical therapy. *T.282*. Dr. Williams placed him on a no-work status. *T.282*. On October 18, 2011, David L. Vidrine, P.T., informed Dr. Williams that the claimant had not received significant benefit from physical therapy. *T.296*. Dr. Williams continued the claimant on a no-work status and recommended a lumbar epidural steroid injection (LESI). *T.284*. A LESI was administered by Steve Wyble, M.D. on December 2, 2011. *T.274-277*.

On December 13, 2011, Dr. Williams' follow up examination revealed pain with palpation at the lower lumbar region, limited range of motion of the lumbar spine, and numbness in the left S1. He recommended a repeat LESI. *T.286-287*. On January 23, 2012, Dr. Williams administered a LESI. *T.288-289*.

On January 13, 2012, Mr. Malveaux was evaluated by orthopedic surgeon Zoran Cupic, M.D., whose examination revealed "severe low back distress," some loss of a normal lumbar lordosis, muscle spasms on both sides, tenderness in the lower lumbar and lumbosacral area, decreased lumbar range of motion, antalgic limp on the left side, difficulty with heel and toe walking, and positive bilateral straight leg raise testing. Dr. Cupic diagnosed lumbosacral strain and possible herniated nucleus pulposis. *T.326-330*.

On March 5, 2012, Mr. Malveaux returned for a follow-up visit with Dr. Cupic and reported that the second LESI provided relief for approximately 4 days. *T.324*. Dr. Cupic's examination results on that day as well as on May 30, 2012 were substantially similar to his findings on January 13, 2012. *T.322-325*.

During an examination on July 11, 2012, Dr. Cupic noted that the claimant's condition had gotten worse and that he was in moderately severe low back distress. *T.319*. He noted lumbar muscle spasm, reduced lumbar range of motion, and positive straight leg testing bilaterally. *T.319*. Dr. Cupic opined that Mr. Malveaux was "unable to go to work at this point." *T.320*. On October 30, 2012, Dr. Cupic's physical examination noted that the claimant was "in moderately severe low back distress." *T.316*. Dr. Cupic noted tenderness of the SI joints and lumbosacral area, limited range of motion of the lumbar spine, and significant muscle spasms. *T.316*.

-5-

Straight leg raising test was still positive on the left at about 40 degrees and on the right at about 50-60 degrees. *T.317*. On November 9, 2012, Dr. Cupic performed lumbar fusion surgery at the claimant's L5-S1 joint. *T.298-301-303.*

On February 12, 2013, a non-examining State agency review physician, Timothy Honigman, M.D., reviewed the available medical evidence and assessed the claimant's residual functional capacity (RFC). *T.71-73, 359*. Dr. Honigman opined that the claimant had the residual functional capacity to occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk 6 hours in an 8 hour day, sit 6 hours in an 8 hour day, and occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl. *T.72*.

On March 1, 2013, the claimant was treated at Opelousas General Hospital for complaints of chest pain. He was given Toradol and prescribed Xanac (Alprazolam) for anxiety and Hydrocodone-Acetaminophen for pain.. *T.362-383*.

On March 6, 2013, he was treated at Oakdale Community Hospital for complaints of chest pain. The medical notes indicated that he "ran out of pain med and anxiety med [] from Dr. Cupic." The clinical impression was anxiety and he was prescribed Xanax and Lorcet (Hydrocodone-Acetaminophen). *T.387*.

The claimant presented for a follow-up visit with Dr. Cupic on March 12, 2013. At that time he complained that the pain in the surgical site, L5-S1, had gotten worse

and he had more neck pain. He reported that he had to go to the emergency room twice because of anxiety attacks. *T. 404.* Dr. Cupic noted the claimant had gained weight such that he could no longer fit into his back brace. *T. 405.* X-rays of the lumbosacral spine revealed the fusion and bone graft to be in good position with no obvious reason for pain. *T. 406.* Dr. Cupic noted that Mr. Malveaux had not had any physical therapy at all and ordered that he increase his activities and physical therapy for the back. He also recommended that the claimant see a psychiatrist, a psychologist, or a neuropsychologist for help with his panic attacks. *T.406.*

On March 21, 2013, the claimant presented at Mercy Regional Medical Center ("Mercy Regional")  with complaints of chest pain. The medical notes indicate that he did not bring his Xanax and Lortab with him. The impression was panic disorder and the claimant was given Xanac and prescribed Xanax and Celexa for anxiety. *T.413-415.*

On March 26, 2013, Mr. Malveaux saw Dr. Rainey for follow-up treatment of anxiety after his visit to Mercy Regional. *T.463.* The claimant's history indicated no exercise and that he was a ½ pack per day smoker. Dr. Rainey's examination indicated that the claimant's psychiatric evaluation showed "good judgment... normal mood and affect and active and alert... orientation to time, place and person" and recent and remote memory normal. His musculoskeletal exam indicated joint, bone

and muscle tenderness. Dr. Rainey's assessment was panic disorder without agoraphobia and displacement of thoracic or lumbar intervertebral disc without myelopathy; he prescribed Xanax (Alprazolam), Celexa (Citalopram), and Elavil (Amitriptyline) for the panic disorder. *T.464-465*.

On April 8, 2013, the claimant was again treated at Mercy Regional for complaints of chest pain and anxiety. *T. 413*. The notes indicate "Positive for anxiety. panic d/o out of xanax." *T.419*. The assessment indicated he was in no apparent distress, was comfortable with appropriate behavior and that his "symptoms have improved." *T. 414-416*. He was assessed with panic disorder and generalized anxiety disorder and given Xanax. *T.413-428*.

On April 9, 2013, after being treated at Mercy Regional, the claimant saw Dr. Rainey again for panic attacks. *T. 466-468*. Dr. Rainey's assessment remained the same and he prescribed Amitriptyline and Alprazolam. *T.468*.

On August 14, 2013, the claimant saw Nurse Practitioner (NP) Melissa Vallet in a follow-up visit to Dr. Rainey, complaining of sleep problems and trouble paying attention.  He indicated he was seen in the Opelousas General Hospital E.R. on July 9, 2013 complaining that the Amitryptyline was not helping.  The claimant was given Ativan as well as prescriptions for Xanax and Trazodone.  He further *T. 485*. His history indicated he was engaged in moderate exercise at Anytime Fitness. His

examination remained unchanged as to constitutional and psychiatric. His musculoskeletal examination noted that he "uses a cane to ambulate." He was assessed with insomnia and prescribed Trazodone. *T.487.*

On October 10, 2013, the claimant attended a follow-up visit with NP Vallet. No history or examination changes were noted at that time and she increased his dosage of Trazodone. *T.490.*

On his February 27, 2014 follow-up visit, Mr. Malveaux was examined by NP Vallet with complaints of sinus problems, muscle aches, joint and back pain, numbness but no weakness, depression at times and anxiety. *T.494.* NP Vallet prescribed Zythromax and sinus remedies, hydrocodone and Neurontin (Gabapentin). *T.495.*

On his March 27, 2014 follow-up, the complainant reported that he "still has some panic attacks while taking Alprazolam." *T.496-498.* His history indicated he continued moderate exercise at Anytime Fitness. *T. 497.* NP Vallet's examination noted that his constitutional, psychiatric and musculoskeletal examination was unchanged and that he was "doing well on current treatment plan will continue." *T.498.*

At the April 21, 2014 hearing on this matter, Dr. George Robert Smith testified as a medical expert. After summarizing the claimant's treatment by Dr. Cupic and Dr.

Rainey, *T. 50-52*, Dr. Smith stated that the claimant's pain would be a disabling factor and the claimant should be limited to lifting no more than "10 pounds on a frequent basis, maybe occasionally 20," "Sitting would be limited by the necessity of his being able to change positions as he needed to do; and "he would not be good on a job that required a lot of stooping, bending, squatting because these will put more stress on his back." *T. 53*. The ALJ gave "some weight" to Dr. Smith's opinion. *T. 33*.

<u>**ANALYSIS**</u>

**A.**   <u>**STANDARD OF REVIEW**</u>

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[12] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[13] Substantial evidence "must do more than create a suspicion of the existence of the fact to be

---

[12]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[13]     *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[14]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[15]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[16]  Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts.[17]  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[18]

---

[14]    *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

[15]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[16]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).

[17]    *Martinez v. Chater*, 64 F.3d at 174.

[18]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

B.     <u>Entitlement to Benefits</u>

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[19]  Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[20]

The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[21]  A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant

---

[19]     See 42 U.S.C. § 423(a).

[20]     42 U.S.C. § 1382(a)(1) & (2).

[21]     42 U.S.C. § 1382c(a)(3)(A).

-12-

lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[22]

## C.   **Evaluation Process and Burden of Proof**

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process required the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work at step five.[23]  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[24]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[25] by determining the most the claimant can still

---

[22]      42 U.S.C. § 1382c(a)(3)(B).

[23]      20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

[24]      *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[25]      20 C.F.R. § 404.1520(a)(4).

do despite his physical and mental limitations based on all relevant evidence in the record.[26]   The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[27]

The claimant bears the burden of proof on the first four steps.[28]   At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[29]   This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[30]   If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to

---

[26]      20 C.F.R. § 404.1545(a)(1).

[27]      20 C.F.R. § 404.1520(e).

[28]      *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[29]      *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[30]      *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

rebut this finding.[31]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[32]

## D.   THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since June 28, 2011.[33]  This finding is supported by the evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments: disorders of the back (20 CFR 404.1571, *et seq*).[34]  The claimant challenges this finding.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[35]  The claimant challenges this finding.

The ALJ found that the claimant has the residual functional capacity to perform work at the light work level except lifting and carrying 10 pounds frequently and 20

---

[31]   *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[32]   *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992), citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

[33]   Id. at 34.

[34]   Id.

[35]   Id. at 36.

pounds occasionally, sit 6 hours in an 8-hour workday, stand and /or walk 6hours in an 8-hour workday, alternate sitting and standing throughout the day.[36]

At step four, the ALJ found that the claimant is not capable of performing his past relevant work.[37]

At step five, the ALJ found that the claimant was not disabled from June 28, 2011 through June 10, 2014 (the date of the decision) because there are jobs in the national economy that she can perform.[38]  The claimant challenges this finding.

## E.   THE ALLEGATIONS OF ERROR

Mr. Malveaux claims that the ALJ erred at step two in failing to find that the claimant's anxiety was a severe impairment in light of multiple emergency room visits for panic attacks and ongoing treatment for diagnosed panic disorder, including prescriptions for anti-anxiety medications. He further claims that the ALJ did not properly evaluate the medical opinion evidence in that she gave more weight to a State agency medical opinion, Dr. Honigman, than to the opinions of a testifying medical expert, Dr. Smith, without providing a sufficient rationale and did not

---

[36]    Id.

[37]    Id. at 41.

[38]    Id.  at 42.

properly account for the functional limitations from Dr. Smith in assessing Mr. Malveaux's residual functional capacity.

## F. DID THE ALJ ERR IN EVALUATING THE SEVERITY OF THE CLAIMANT'S MENTAL IMPAIRMENT IN STEP TWO?

The ALJ concluded that the claimant had severe impairments of disorders of the back. The ALJ also considered the claimant's medically determinable mental impairments of depression and anxiety but concluded that they did not qualify as severe impairments. In *Stone v. Heckler*, the Fifth Circuit established the following standard for determining whether a claimant's impairment is severe:  an impairment is not severe only when it is a "slight abnormality" having "such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education[,] or work experience."[39]

Federal regulations require that the ALJ follow mandatory steps when evaluating the severity of mental impairments in claimants at Step Two of the disability analysis.[40]  In evaluating mental disorders, the ALJ first considers whether a claimant has a medically determinable mental impairment.[41]  To do so, the ALJ must

---

[39]     *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir.1985).

[40]     20 C.F.R. §§ 404.1520a(a), 416.920a(a).

[41]     See 20 C.F.R. Pt 4, Subpt. P, App. 1 § 12.00; 20 C.F.R. §§ 404.1520a(b)(l), 416.920a(b) (l).

specify the symptoms, signs, and laboratory findings that substantiate the presence of each impairment.[42] The regulations require the ALJ to evaluate the degree of functional loss resulting from the claimant's mental impairments.[43]  If an impairment is found, the ALJ must evaluate the claimant's limitations in four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.[44]  The degree of limitation in the first three functional areas is rated on a five-point scale, which includes none, mild, moderate, marked, and extreme; the degree of limitation in the fourth functional area is rated on a four-point scale which includes none, one or two, three, and four or more.[45]  The ALJ's written decision must incorporate pertinent findings and conclusions based on this technique and must include a specific finding of the degree of limitation in each of the functional areas described.[46]

---

[42]     20 C.F.R. §§ 404.1520a(b)(l), 416.920a(b)(l); *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001).

[43]     20 C.F.R. §§ 404.1520a(b) (2), 416.920a(b)(2).

[44]     20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

[45]     20 C.F.R. § 404.1520a(c)(4).

[46]     20 C.F.R. §§ 404.1520a(e), 416.920a(e).

After the ALJ rates the degree of functional limitation resulting from any mental impairment, the ALJ determines the severity of the impairment.[47] If the degree of functional loss falls below a specified level in each of the four areas, the ALJ must find the impairment is not severe at Step Two of the sequential evaluation process.[48] The regulations contain a presumption that if the claimant's degree of limitation is rated as none or mild in the first three functional areas and as none in the fourth area, the ALJ will generally conclude that the claimant's mental impairment is not severe.[49] However, this presumption may be rebutted if "the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities."[50]

Here, the ALJ determined at Step Two that the claimant's depression and anxiety were not severe impairments:

> [T]he claimant's alleged anxiety, depression and panic attacks are no more than a [sic] slight abnormalities, which would not be expected to interfere with his ability to do work regardless of age, education, or

---

[47]    20 C.F.R. §§ 404.1520a(d), 416.920a(d).

[48]    20 C.F.R. §§ 404.1520a(d) (1), 416.920a(d)(1).

[49]    20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

[50]    20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).  See, also, *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985) (establishing the following standard for determining whether a claimant's impairment is severe: An impairment is not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience).

work experience. Therefore, the undersigned finds the claimant's alleged mental impairments are not severe as defined in the Social Security Act and Regulations. *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985).

With regard to the claimant's depression and anxiety – a mental impairment – the ALJ reviewed whether this impairment results in limitations in three relevant functional categories and whether there have been episodes of decompensation.  The ALJ found that the claimant's depression and  anxiety does not limit him in any of the functional categories and further found that there have been no episodes of decompensation. These conclusions are supported by substantial evidence in the record.  Perhaps most important, the  claimant's treating surgeon, Dr. Cupic, advised him to seek treatment by "a psychiatrist, a  psychologist, or a neuropsychologist." There is, however, no evidence of any treatment by a mental health physician or at a mental health facility. If a claimant fails to follow the treatment prescribed by his physician, he will not be found disabled so long as the record does not excuse the lack of treatment or otherwise support disability.[51] In other words, a "treatable condition which a claimant declines or refuses to treat is not disabling."[52]

Moreover, such lack of evidence indicates the condition is controlled with the medication for anxiety which the claimant's primary care physician, Dr. Rainey,

---

[51]     20 C.F.R. § 404.1530; *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990).

[52]     *Mosby v. Apfel*, No. 99-1031, 2000 WL 174897, at *4 (E.D. La. Feb. 14, 2000).

prescribed. Dr. Rainey's examination records over the period of a year consistently state that the claimant exhibited  "insight and good judgment," his mental status was "normal mood and affect and active and alert  and he was oriented to time, place and person. Dr. Rainey's latest examination on March 27, 2014 indicated the claimant was "doing well on current treatment plan will continue."   Furthermore, as the ALJ found at the hearing in this matter, the claimant was able to maintain attention and concentration as required for participation at the hearing and interacted appropriately with the ALJ.

The ALJ's RFC determination is substantiated by the record. The claimant is not entitled to relief on this claim.

## G.  THE ALJ'S EVALUATION OF THE MEDICAL EVIDENCE AND EVALUATION OF THE CLAIMANT'S RESIDUAL FUNCTIONAL CAPACITY

Mr. Malveaux also claims that the ALJ erred by failing to state reasons for assigning "some" weight to the opinions of Dr. Smith, the testifying expert, and "significant" weight to the opinions of Dr. Honigman, the state agency review physician; by failing to provide an explanation for omitting postural limitations from his residual function capacity; and by failing to specify any limitation as to his need to alternate sitting and standing.

Here, the ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources.  The ALJ considered the claimant's testimony related to his daily activities and the impairments he reported. Finding that the claimant's subjective complaints were not fully credible, the ALJ concluded that the claimant's allegations of disabling symptoms and limitations were "not fully supported by the evidence presented at the hearing."  The ALJ further noted that the claimant had not generally received the type of medical treatment expected for a totally disabled individual in that his alleged debilitating back pain had received nothing more than routine and/or conservative treatment and no additional surgery was recommended. The ALJ further found that the claimant had not been entirely compliant in taking his prescribed medications and that the claimant's treating physicians had placed no restrictions or limitations on his activities. To the contrary, his treating surgeon had ordered that he become more active, which the claimant failed to follow.

The ALJ noted that non-examining or treating physicians' opinions, such as Dr. Honigman and Dr. Smith, "do not as a general matter deserve as much weight as those of examining or treating physicians, those opinions do deserve some weight." *T. 37*. The ALJ noted that Dr. Smith testified at the hearing that the claimant's impairment was "pain pure and simple." *Tr. 33, 53*. The ALJ's credibility assessment

-22-

of the claimant's allegations provide an explanation for the ALJ's giving Dr. Smith's opinion "some" weight. Even so, the ALJ adopted Dr. Smith's opinion that the claimant needed to alternate sitting and standing. The ALJ provided more specific restrictions using Dr. Honigman's opinion that the claimant be limited to "stand or walk 6 hours in an 8 hour day, sit 6 hours in an 8 hour day."

The claimant also complains that Dr. Honigman and Dr. Smith reported postural and environmental limitations that the ALJ failed to consider and mention in his decision. The ALJ had opinions before him from two medical sources that addressed the claimant's abilities to sit and stand as well as stoop, bend and squat: one by Dr. Smith, the consultative examiner stating that the claimant would not be good on a job that required a lot of stooping, bending and squatting, and the other by Dr. Honigman, the State agency consultant, stating that the claimant should only "occasionally stoop, kneel, crouch, and crawl." As indicated above, neither of the claimant's treating physicians listed any restrictions. Because both Dr. Smith and Dr. Honigman were nontreating sources, the ALJ was not required to give these opinions controlling weight. See 20 C.F.R. §§ 404.1502, 416.902. Also, as with all nontreating physicians' opinions, an ALJ is free to incorporate only those limitations that he finds "consistent with the weight of the evidence as a whole." *Hernandez v. Astrue*, 278 Fed.Appx. 333, 338 (5th Cir.2008).

-23-

The claimant's medical records provide no objective medical signs or laboratory findings that evidence the existence of any postural limitations. Accordingly, the Court cannot say that the ALJ erred in refusing to include postural limitations that she judged to be unsupported by the objective evidence. Ultimately, the ALJ's failure to include the additional postural limitations recognized by Dr. Honigman and Dr. Smith was harmless error because of the three representative occupations cited by the ALJ—price marker, power screwdriver operator, and storage facililty rental clerk. Price marker and power screwdriver operator require no postural activity such as stooping, and stooping and kneeling are required no more than occasionally in the storage facility clerk job. *See Dictionary of Occupational Titles* (4th ed. 1991), § 209.587-034 (Price Marker), 1991 WL 671802; § 699.685-026 (Power Screwdriver Operator), 1991 WL 678865; § 295.367-026 (Storage Facility Rental Clerk), 1991 WL 672594-026. *See, Williams v. Colvin,* 2016 WL 1182220, at *9 (S.D.Tex., 2016).

Finally, as to the claimant's contention that the ALJ erred in failing to specify the frequency of the claimant's sit/stand option, the vocational expert testified that a hypothetical individual who "must alternate sitting after 30 minutes at which point he'd stand for a short period before returning to a seated position" could still perform

-24-

work as a price marker, power screwdriver operator or storage facility rental clerk. Tr. 60-61. *See Id.*

Also, as other courts have found, since the ALJ failed to specify a frequency, it is assumed that the "sit/stand option" given by the ALJ was implicitly "as needed" or "at will." A sit/stand option as needed necessarily encompasses frequent sitting and standing, allowing an employee broad flexibility, and thus has a more restrictive effect on the jobs available to him. *See Young v. U.S. Com'r of Social Sec.*, 2009 WL 2827945, at *12 (W.D.La.,2009) (citing *Ketelboeter v. Astrue*, 550 F.3d 620, 626 (7th Cir.2008) and *Williams v. Barnhart*, 140 Fed.Appx. 932, *4 (11th Cir.2005)).

## CONCLUSION AND RECOMMENDATION

The undersigned finds that the ALJ applied appropriate legal standards in ruling on this case, and the ALJ's findings are based on substantial evidence in the record.  Accordingly,

**IT IS THE RECOMMENDATION** of the undersigned that the decision of the Commissioner be **AFFIRMED** and this matter dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after

receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 13th day of March 2017.

CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE